UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )     Cr. No. 04-10033 PBS
        v.                       )
                                 )
EDDY LOPEZ, A/K/A "SWIFT"        )
  Defendant.                     )

**TRIAL BRIEF OF THE UNITED STATES**

The United States, by its undersigned attorneys, respectfully submits this trial brief to identify relevant issues in accordance with the Court's Pretrial Order.  The trial of this matter is scheduled to begin on September 7, 2004.

**I.   INTRODUCTION**

On or about June 24, 2004, the defendant, Eddy Lopez, was charged in a five-count Superseding Indictment as follows:

COUNT ONE:  Conspiracy to Distribute Heroin and Cocaine in violation of 21 U.S.C. § 846;

COUNT TWO:  Being a Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1);

COUNT THREE:  Distribution of Heroin on or about December 15, 2003, in violation of 21 U.S.C. § 841(a)(1);

COUNT FOUR:  Distribution of Cocaine on or about December 17, 2003, in violation of 21 U.S.C. § 841(a)(1);

COUNT FIVE:  Possessing a Firearm in Furtherance of a Drug Trafficking Crime on or about January 20, 2004, in violation of 18 U.S.C. § 924(c)(1).

## II.  SUMMARY OF GOVERNMENT'S CASE

### A.  Background

This indictment arose from an investigation by the Federal Bureau of Investigation ("the FBI") into drug trafficking and other suspected criminal behavior in the Lawrence, Massachusetts area by members and associates of the Dome Dwellers.

### THE PURCHASE OF A NINE MILLIMETER HANDGUN AND 19.6 GRAMS OF HEROIN FROM LOPEZ ON DECEMBER 15, 2003

In late Fall 2003, a cooperating witness working with the FBI (the "CW") had several conversations with EDDY LOPEZ, A/K/A "SWIFT", many of which were consensually recorded, in which they talked about LOPEZ selling the CW a gun and drugs.[1]  These conversations culminated on December 15, 2003, when LOPEZ sold the CW a Smith and Wesson nine millimeter handgun for $950 and 19.6 grams of heroin for $1,700.[2]

On December 15, 2003, at LOPEZ's direction, the CW picked up LOPEZ at LOPEZ's house, 594 Haverhill Street, Apt. 1, in

---

[1] The CW is a former member of the Latin Gangsta Disciples from Lawrence, a rival gang of the Dome Dwellers.  The CW has a significant criminal record and was paid in connection with his cooperation in this case.  The CW has a past history with LOPEZ, including an occasion where they shot at each other.

[2] Prior to all of the buys in this case, agents searched the CW and the car he/she would be driving to ensure that the CW had no controlled substances or cash on him/her.  Upon completing the search, the CW was given a recording device, a transmitter, a set amount of official government funds ("OGF"), and a car equipped with audio/video surveillance equipment.  All of the buys and many of the conversations leading up to them were consensually recorded on audio and/or videotape.

2

Lawrence, where LOPEZ lived with his mother, Neida Torres.  The
CW and LOPEZ then drove in the CW's car, which was equipped with
a video recording device, to the residence of Victor Delgado, 30
May Street in Lawrence, an associate of LOPEZ.[3]  When they got
there, surveillance agents saw LOPEZ and the CW get into a van
in the parking lot.  Inside the van, LOPEZ retrieved a 9
millimeter, Smith & Wesson, Model 39-2, semi-automatic pistol,
bearing serial number A412638, from under the seat and gave it
to the CW in exchange for $950.

    The CW was wearing a recording device during this
transaction.  LOPEZ and the CW can be heard in the van, in
English, praising the looks of the gun and then LOPEZ can be
heard stating that it "goes off like a motherfucker . . . boom,
boom, boom, boom . . ."  The CW then asked LOPEZ if he had
gotten an extra clip for the CW and LOPEZ replied no "but I'll
get you another clip nigger."  LOPEZ also explained that the
"Feds" are on him because he sold a "burner" (a firearm) to
someone in Manchester who had later been arrested and LOPEZ was
concerned the individual had snitched on him.

    The CW and LOPEZ then discussed the heroin and LOPEZ said
it would cost $850 for ten grams and that he would call his
"connect" right now.  LOPEZ talked more about his gun business
and he handed the gun to the CW.  The CW gave LOPEZ $800 in OGF

---

[3] Delgado is the subject of a separate indictment.

in exchange and told LOPEZ that he/she would give LOPEZ the additional $150 at a later time.  They agreed that the CW would call LOPEZ later to do the heroin deal.  Agents saw both the CW and LOPEZ exit the van and recognized LOPEZ from his Registry of Motor Vehicle photograph.  Shortly thereafter, agents saw the CW leave the area in the CW's car and followed him/her back to the meeting location where he/she gave them the Smith and Wesson nine millimeter handgun.[4]

At approximately 4 p.m. on December 15, 2003, the CW (in the presence of an agent) received an incoming, consensually recorded call from LOPEZ in which LOPEZ told the CW to meet him at the house he lives in with his mother at the corner of Haverhill and Ames Streets.  Under surveillance, and wearing a recording device, the CW went to 594 Haverhill Street (at the corner of Ames and Haverhill Streets in Lawrence) and met with LOPEZ in the first floor apartment that LOPEZ shares with his mother.

The CW and LOPEZ went into LOPEZ's bedroom and LOPEZ told the CW that he (LOPEZ) had some hollow points for the gun that they could get from "RONNIE" on Howard Street later that night. The CW gave LOPEZ the $1,700 in OGF and LOPEZ pulled what appeared to the CW to be three ounces of cocaine from what the

---

[4]This firearm was successfully test fired.  ATF records and interviews indicate that this firearm was part of a multi-firearm sale in New Hampshire in 2001.

CW described as a "Saint Louis" jersey, showed it to the CW, and LOPEZ said that he sells both cocaine and heroin.  LOPEZ told the CW that he got the three ounces from a kilogram of cocaine and quoted the CW various prices for different amounts of cocaine.  LOPEZ subsequently called his supplier and told the CW it would be five minutes.[5]  A short time later, LOPEZ left the room and returned with two "fingers" of heroin and gave it to the CW in exchange for the $1,700 in OGF.

After giving LOPEZ a ride, under surveillance, to and from a market on Haverhill Street, the CW was followed back to a nearby location where he/she handed agents the heroin.  DEA NERL certified that the substance the CW purchased from LOPEZ contained 19.6 grams of heroin hydrochloride.

## THE PURCHASE OF 13.3 GRAMS OF COCAINE FROM LOPEZ ON DECEMBER 17, 2003

On December 17, 2003, the CW told agents that he/she had received a call from LOPEZ who told the CW that "they" had done a home invasion and gotten 240 grams of heroin, and that LOPEZ had twenty grams to sell to the CW for $1,200.  That evening, the CW made a consensually recorded call to 978-397-2180, LOPEZ's cellular telephone, and LOPEZ told the CW to meet LOPEZ at Delgado's house.

---

[5] In connection with both drug sales, LOPEZ repeatedly referred to getting the drugs from his "connect".

At approximately 7:20 p.m., agents set up surveillance at 30 May Street in Lawrence (i.e., Delgado's residence) and the CW, while wearing a recording device, was followed to 30 May Street.  The CW went into 30 May Street, Apt. C, and met with LOPEZ and Delgado.  LOPEZ was sitting on a couch holding a bag containing what appeared to the CW to be five to six ounces of cocaine.  LOPEZ put the bag on the couch and then threw the CW a small bag of cocaine, explaining to the CW that it was better than the cocaine LOPEZ had shown the CW at LOPEZ's house the other day.  The CW then gave LOPEZ $600 in OGF for the cocaine.

The CW asked LOPEZ how much cocaine he had in the bag and LOPEZ said that he had 130 grams in the bag and that he was going to sell it to a kid for $3,000.  The CW asked LOPEZ about getting some heroin and LOPEZ told the CW to talk to Delgado. LOPEZ also said that his cousin was selling LOPEZ a .45 semi-automatic pistol and explained that he (LOPEZ) was adding to his collection of guns.  The DEA laboratory later certified that the substance the CW purchased from LOPEZ contained 13.3 grams of cocaine hydrochloride.

### THE JANUARY 20, 2004 SEARCH OF 594 HAVERHILL STREET, APT. 1

On January 20, 2004, pursuant to arrest and search warrants, agents arrested LOPEZ at his residence, 594 Haverhill Street, Apt. 1 in Lawrence, and conducted a search of the residence.  594 Haverhill Street, Apt. 1, is the home of LOPEZ

and his mother.  Agents found a Heckler Koch ("HK") USP Compact
.45 caliber automatic pistol bearing serial #29-013016, loaded
with a magazine containing 8 bullets, in the pocket of a jacket
in the closet in LOPEZ's bedroom.[6]

Agents also found numerous items consistent with drug
trafficking throughout the apartment, including in LOPEZ's
bedroom and in the closet where the gun was found.  Among other
things, the following items were recovered during the search:
a coffee grinder that tested positive at DEA NERL for traces of
heroin hydrochloride and cocaine hydrochloride; a scale that
tested positive at DEA NERL for traces of cocaine hydrochloride;
a metal press that tested positive at DEA NERL for traces of
cocaine hydrochloride; drug ledgers; hundreds of small plastic
ziplock baggies with stamps of different types on them (commonly
used for packaging small amounts of cocaine and heroin for
street-level distribution); a police scanner; two pagers; and a
knife and a razor.

In addition, agents found cutting agents in LOPEZ's
bedroom.  It is anticipated that DEA Chemist Maureen Craig will
testify that the white powder substance in a clear plastic bag

---

[6] While taking LOPEZ to the police station, agents asked LOPEZ if
there was a gun in the house.  LOPEZ said there was a gun under
his bed.  When no gun was found under the bed, agents again asked
LOPEZ about the gun and LOPEZ said that he had forgotten that he
had it with him the previous night and that it was in his coat
pocket in the closet.

found in the top drawer of the nightstand in LOPEZ's bedroom
contained approximately 22 grams of Benzocaine, which she will
testify is a common cutting agent or adulterator for cocaine and
heroin in part because it is a local anesthetic and makes,
particularly, cocaine seem stronger.  It is also expected that
Ms. Craig will testify that the white powder substance found in
a ziplock bag in the top shelf of the closet in LOPEZ's bedroom
(the same closet where the gun was found) contained
approximately 122.9 grams of Borac acid, which she will testify
is a common cutting agent for cocaine in part because of its
shiny appearance (which makes cocaine look pure).  It is also
expected that Ms. Craig will testify that the substance found in
a plastic bottle on the VCR in LOPEZ's bedroom (along with a
knife and a razor) contained approximately 206.9 grams of
Inositol, which she will testify is a common cutting agent for
cocaine and heroin.

The firearm recovered from LOPEZ's bedroom on January 20,
2004 was successfully test fired.  Heckler Koch firearms have
never been manufactured in Massachusetts.

## III.  **STIPULATIONS OF FACT**

The government recently provided defense counsel with the
following proposed stipulations (but has not yet heard back).

<u>Drug Stipulation</u>

That the heroin purchased on December 15, 2003, and marked
as Exhibit _____, was analyzed by the Drug Enforcement
Administration's Northeast Laboratory and found to contain 19.6
grams of heroin hydrochloride.

That the cocaine purchased on December 17, 2003, and marked
as Exhibit _____, was analyzed by the Drug Enforcement
Administration's Northeast Laboratory and found to contain 13.3
grams of cocaine hydrochloride.

<u>Prior Felony Stipulation</u>

That, prior to December 15, 2003, the defendant had been
convicted of a crime punishable by imprisonment exceeding one
year.

<u>Firearm Stipulations</u>

Exhibit _____ is a 9 millimeter, Smith & Wesson, Model 39-2,
semi-automatic pistol, bearing serial number A412638.  This
firearm traveled in interstate commerce before December 2003.

Exhibit ____ is a .45 automatic HK semi-automatic pistol,
Model USP Compact, bearing serial number 29-013016.  This
firearm was manufactured outside of Massachusetts and traveled
in interstate commerce before January 2004.

Since December 15, 2003, both pistols have been test fired.
Both pistols are designed to expel a projectile by the action of
an explosive and, thus, each is a firearm for the purposes of

Title 18, United States Code, Section 922(g), which sets forth

the crime with which the defendant is charged in this case.

**IV.    EXPERT DISCLOSURES**

On June 28, 2004, the government made the following expert

disclosures.[7]

DETECTIVE GREG BROWN

The government expects that Detective Greg Brown of the
Boston Police Department will testify about how heroin and
cocaine are purchased, weighed, mixed with other
substances, and sold, including how drug traffickers use
certain narcotics' paraphernalia, such as scales, coffee
grinders, cutting agents, pagers, and small plastic baggies
(with different types of stamps on them) for street level
distribution of drugs, and about how drug traffickers keep
drug ledgers, and about the meaning of certain drug
trafficking terms, including but not limited to "one for
one" (i.e., mixing drugs and cutting agent equally or one
part drugs one part cut) and "stomp on" (i.e., mix the
drugs heavily with cutting agent).  It is also expected
that Detective Brown will testify that distributors of
controlled substances, such as heroin and cocaine, often
possess and carry firearms, and do so in order to protect
themselves, their stored and/or carried quantities of drugs
and/or money, and the geographic "turf" in which they
distribute drugs.

Detective Brown has been a Boston Police Officer for
approximately 17 years and has extensive experience in drug
investigations and prosecutions.  For the past twelve
years, Detective Brown has worked in the Youth Violence
Strike Force, also known as the Gang Unit.  Prior to that,
he worked in the Anti-Crime Unit for 3 years and as a
uniformed police officer for a year and a half.  The Gang
Unit has city-wide responsibility, and Detective Brown has

---

[7] Unless there is a stipulation concerning the firearms, the
government will be supplementing its expert disclosure to address
the firearms purchased and seized from the defendant (i.e., that
traveled in interstate commerce and, to the extent necessary
since they were successfully test fired, that they were each
designed to expel a projectile by the action of an explosive.

experience in conducting gang-related narcotics investigations throughout the City of Boston and the surrounding areas. Detective Brown has spent approximately 80% of his time in the last fifteen years investigating gang related crimes involving drug trafficking and/or guns.

Detective Brown has arrested thousands of individuals for drug trafficking crimes and been involved in approximately 2,000 drug trafficking investigations, of which approximately 1/3 also involved guns. Detective Brown has interviewed or debriefed numerous individuals involved in drug trafficking and drug use and has formalized training in narcotics investigations and in the manner and quantities in which narcotics are sold. He has also made approximately 250 undercover drug buys and supervised numerous drug buys confidential informants. He has attended two 40 hour courses provided by the U.S. Drug Enforcement Administration and has attended numerous in-service training sessions related to narcotics trafficking. Detective Brown has testified as an expert on numerous occasions, including on numerous and recent occasions in federal court in Boston.

SPECIAL AGENT MARK KARANGEKIS

The government expects that Special Agent Mark Karangekis of the Federal Bureau of Investigation may also testify (or may testify instead of Detective Brown depending on their respective schedules) about his experience regarding the methods of drug trafficking heroin and cocaine in the Lawrence, MA, area, and about how heroin and cocaine are purchased, weighed, mixed with other substances, and sold, including how drug traffickers use certain narcotics' paraphernalia, such as scales, coffee grinders, cutting agents, pagers, and small plastic baggies (with different types of stamps on them) for street level distribution of drugs, and about how drug traffickers keep drug ledgers, and about the meaning of certain drug trafficking terms, including but not limited to "one for one" (i.e., mixing drugs and cutting agent equally or one part drugs one part cut) and "stomp on" (i.e., mix the drugs heavily with cutting agent). It is also expected that Detective Brown will testify that distributors of controlled substances, such as heroin and cocaine, often possess and carry firearms, and do so in order to protect themselves, their stored and/or carried quantities of drugs and/or money, and the geographic "turf" in which they distribute drugs.

11

S/A Karangekis has been a Special Agent with the FBI for 12 years.  From 1998 through approximately May of 2004, Special Agent Karangekis served as Coordinator for the North Shore Gang Task Force, which was responsible for investigating gang violence, drug trafficking, and gun involvement in the North Shore area of Massachusetts. During that time, the Gang Task Force focused many of its investigations on street gangs in the Lawrence area.  S/A Karangekis has been involved in approximately a dozen gang-related investigations, and hundreds of drug trafficking investigations, many of which involved firearms.

DEA CHEMIST MAUREEN M. CRAIG

As stated in the parties' Joint Initial Status Report, unless there is a stipulation regarding the drugs seized in this case, the government anticipates that Senior Forensic Chemist Maureen M. Craig of the Drug Enforcement Administration will testify that the substance purchased from your client on December 15, 2003 contained heroin hydrochloride and that the substance purchased from your client on December 17, 2003 contained cocaine hydrochloride.

It is also anticipated that Ms.  Craig will testify about the substances found during the search of your client's home on January 20, 2004.  In particular, it is anticipated that Ms. Craig will testify that the white powder substance in a clear plastic bag found in the top drawer of the nightstand in your client's bedroom contained approximately 22 grams of Benzocaine, which she will testify is a common cutting agent or adulterator for cocaine and heroin in part because it is a local anesthetic and makes, particularly, cocaine seem stronger.  It is also expected that Ms. Craig will testify that the white powder substance found in a ziplock bag in the top shelf of the closet in your client's bedroom (the same closet where the gun was found) contained approximately 122.9 grams of Borac acid, which she will testify is a common cutting agent for cocaine in part because of its shiny appearance (which makes cocaine look pure).  It is also expected that Ms. Craig will testify that the substance found in a plastic bottle on the VCR in your client's bedroom (along with a knife and a razor) contained approximately 206.9 grams of Inositol, which she will testify is a common cutting agent for cocaine and heroin.

Ms. Craig has been a DEA laboratory chemist for 12.5 years. A copy of her C.V. is attached hereto.

V.   **ANTICIPATED EVIDENTIARY ISSUES**

In its 21 day letter, the government advised defense

counsel as follows with respect to FRE 404(b) evidence.

The government does not believe that it will be introducing any evidence properly considered to be 404(b) evidence. The government does advise you, however, of its intent to offer into evidence certain statements (below and also described in the reports previously provided to you) that the government believes are not 404(b) because directly relevant to the charges set forth in the indictment.  To the extent that any portion of these conversations or any other event below regarding the activities of the defendant are considered to be 404(b) (which the government denies), you are hereby advised that the government will seek to introduce them into evidence.

The government intends to offer statements by the defendant to [the CW] made at the defendant's house in Lawrence on December 15, 2003 in connection with the controlled purchase of two fingers of heroin by [the CW] from the defendant.  In this connection, it is anticipated that [the CW] will testify that the defendant showed him approximately 2 to 3 ounces of cocaine that that the defendant had in the closet of his bedroom and that the defendant told [the CW] that he got the 2 to 3 ounces "straight from the kilo" (i.e., a kilogram of cocaine), that he sells more cocaine than heroin, and that he quoted [the CW] a price of $1,500 for 3 ½ ounces of cocaine and $800 to $900 per half ounce of cocaine, and that the defendant told [the CW] that he can supply him with cocaine in both powder and crack form but that he needs time to cook the cocaine into crack.

The government also intends to offer evidence that, on or about December 17, 2003, the defendant contacted [the CW] and offered to sell [the CW] twenty grams of heroin for $1,200, and that the defendant told [the CW] that "they" had done a home invasion and had gotten 240 grams of heroin.  The government also intends to offer evidence that, during the controlled purchase of cocaine by [the CW] from the defendant at the apartment of Victor Delgado in Lawrence, the defendant showed [the CW] a bag containing

13

approximately 5 to 6 ounces of cocaine and said that it was better cocaine than that which the defendant showed [the CW] the other day at the defendant's house, and then sold [the CW] the 13.3 grams of cocaine that is the subject of Count 4 of the Indictment.  The government expects that [the CW] will testify that he asked the defendant how much cocaine he had in the bag and the defendant said that he had 130 grams in the bag and was selling it to some kid for $3,000.

The government also expects to introduce statements by the defendant to [the CW] at Victor Delgado's apartment on December 17, 2003, that the defendant's cousin was selling him a .45 automatic, that [the CW] offered to buy it, and the defendant said he was going to keep it.

The government also intends to offer statements by the defendant to The CW on December 4, 2003 at the apartment of Victor Delgado that the defendant sells heroin in gram quantities because there was too much risk in selling heroin in smaller quantities, and that the defendant stated that he buys his heroin from a source in New York and that he has a special belt to carry eggs of heroin.

The government also intends to offer evidence that, while [the CW] was at the apartment of Victor Delgado on November 17, 2003, the defendant pulled out a small automatic pistol and showed it to [the CW].

The government also intends to offer statements made by the defendant in connection with his sale of a firearm to [the CW] on December 15, 2003, as summarized in the reports previously provided to you (and as indicated in the tape recording played at the detention hearing).

The government has made requests for discovery from the defendant and has served the defendant with a Notice of Alibi to which no response has ever been made.

Respectfully submitted,

MICHAEL J. SULLIVAN

United States Attorney


By: S/ PETER K. LEVITT
    PETER K. LEVITT
    Assistant U.S. Attorney


Dated:  July 28, 2004

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served Ray

Gillespie, Esq., a copy of the foregoing document by facsimile.


S/ PETER K. LEVITT
PETER K. LEVITT
ASSISTANT UNITED STATES ATTORNEY

16