```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,     )
                              )    Cr. No. 04-10033 PBS
      v.                      )
                              )
EDDY LOPEZ, A/K/A "SWIFT"     )
   Defendant.                 )
```

### SENTENCING MEMORANDUM OF THE UNITED STATES

On September 30, 2004, the defendant, Eddy Lopez (the "defendant" or "Lopez"), was convicted after a jury trial of (i) conspiracy to distribute more than 500 grams of cocaine and (ii) possessing a firearm in furtherance of a drug trafficking offense. On September 17, 2004, Lopez had pled guilty to the other charges in the Second Superseding Indictment: conspiring to distribute heroin and cocaine (Count 1) (the indictment alleged that Lopez conspired to distribute more than 100 grams of heroin and more than 500 grams of cocaine, both of which allegations implicated the statutory 5 year mandatory minimum sentence; the defendant did not plead to the drug weight); two substantive counts of, respectively, distributing heroin and distributing cocaine (Counts 3 & 4); and one count of being a felon in possession of a firearm (Count 2). Sentencing is scheduled for December 21, 2004.

The Presentence Report prepared by the U.S. Probation Office, dated December 8, 2004 (the "PSR"), properly concluded that the defendant is a career offender, pursuant to U.S.S.G. §

4B1.1, and properly calculated the defendant's Total Offense Level as 37 and his Criminal History Category as VI, and that the mandatory five year, on and after, sentence imposed by 18 U.S.C. § 924(c), is added to the sentencing range of 360 months to life. Accordingly, the PSR concluded that the defendant's Guideline Sentencing Range is 420 months to life.  This memorandum is submitted to assist the Court in sentencing the defendant.

   A.   **BACKGROUND**

This case arose from a six-month investigation by the Federal Bureau of Investigation ("the FBI") into drug and gun trafficking in the Lawrence, Massachusetts area by members and associates of a street gang called the Dome Dwellers.  During the course of the investigation Lopez was identified by law enforcement and other sources as the leader of the Dome Dwellers.

On December 15, 2003, Lopez sold a cooperating witness working with the FBI (the "CW") a Smith and Wesson nine millimeter handgun and 19.6 grams of heroin.[1]  The CW picked up Lopez's house, 594 Haverhill Street, Apt. 1, in Lawrence, where Lopez lived with his mother, Neida Torres.  The CW and LOPEZ then

---

[1] Prior to all of the buys in this case, agents searched the CW and the car he/she would be driving to ensure that the CW had no controlled substances or cash on him/her.  Upon completing the search, the CW was given a recording device, a transmitter, a set amount of official government funds ("OGF"), and a car equipped with audio/video surveillance equipment.  All of the buys and many of the conversations leading up to them were consensually recorded on audio and/or videotape.

drove in the CW's car, which was equipped with a video recording device, to the residence of Victor Delgado (a/k/a "Bitin"), 30 May Street in Lawrence, an associate of Lopez.[2] When they got there, Lopez and the CW got into a van in the parking lot and an, Lopez retrieved a 9 millimeter, Smith & Wesson, Model 39-2, semi-automatic pistol, bearing serial number A412638, from under the seat and gave it to the CW in exchange for $950.

During the ride to Delgado's house, the CW and Lopez discussed the gun and the drugs. The videotape of that conversation was played during the trial. Among other, Lopez and the CW engaged in the following exchange.

LOPEZ: No I had because yesterday, my cousin came through and that nigger said yo cuz I know you came from Springfield with that shit. And I was like, yeah I got it. And he was like, yo whats up nigger? And I'm like, nah cause its already sold. And he's like, how much are you bumping it for. And I'm like, nah cause I'm getting some good dough for it, you know what I'm saying?

DIAZ: (unintelligible)

LOPEZ: And he was saying, yo cuz, I'll give you right now eight right now. And I was like, no nigger, I already got it bumped, this was a promesa (promise) you know what I'm saying? I can't . . . and I brought that shit down . . .

DIAZ: I was wishing you had brought like at least like two nigger. I woulda copped them man.

LOPEZ: I just took like, like the the you know newest one I took cause they had a .357 but, it was the long nose.

---

[2] Delgado was the subject of a separate indictment and pled guilty to gun and heroin trafficking charges.

3

|         | |
|---------|-|
|         | You don't want none of that shit. |
| DIAZ:   | Old Dirty Harry. |
| LOPEZ:  | I like the slim one, the <u>chiquita</u> (small one) |
| DIAZ:   | Yeah, the one that Bitin has. |
| LOPEZ:  | No, its smaller than that.  Those are the ones that I like. |
| DIAZ:   | Smaller than that? |
| LOPEZ:  | Yeah, they got them smaller than that.  But, I got you a nine mil, Smith & Wesson. |
| DIAZ:   | You put a <u>balita</u> (little bullet), or no? |
| LOPEZ:  | Ah, no.  <u>Ya tiramos las balas ayer</u>.  (We shot the bullets yesterday already.) |
| DIAZ:   | Ah, damn, you see, you niggas didn't . . . |
| LOPEZ:  | <u>Probando, mijo, probando</u>!  (Testing, dude, testing!) |
| DIAZ:   | No, but damn, I wanted to test it too . . . |
| LOPEZ:  | You test it.  You fill that bitch up and . . . boom, boom, boom, boom, boom, boom! |
| DIAZ:   | and now I need the bullets . . . |
| LOPEZ:  | in the highway, in the highway . . . |
| DIAZ:   | . . . bullets |
| LOPEZ:  | No, I got bullets for, I got bullets for you.  I just got em on Howard Street. |
| DIAZ:   | Oh, alright. |
| LOPEZ:  | I got a whole sock for you. |
| DIAZ:   | Where we going. |
| LOPEZ:  | Right there to Bitin's house.  I got a whole sock for you my man. |

4

On the audiotape of this meeting, which was also played at the trial, Lopez and the CW (who was wearing a recording device) can be heard in the van talking more about the gun.

LOPEZ:    Smith & Wesson baby.

DIAZ:     That's a nasty one too, nigga.

LOPEZ:    (unintelligible) this thing pulls off like a motherfucker . . . . boom, boom, boom, boom, boom, boom, boom!

LOPEZ:    Its ten.  You can get the clip extended.

DIAZ:     You didn't get me another clip for it?  No?

LOPEZ:    No, but I'll get you another clip, man.  <u>Eso es lo de menos.  Yo cuando me propongo una cosa, yo la consigo</u>.  (That's not a big deal.  When I decide on something, it get it.)

DIAZ:     Nah, not doubt.

LOPEZ:    Listen Georgie, you didn't get this gat from me.

DIAZ:     (unintelligible) Eddy

LOPEZ:    You, you, you found that shit, you know what I'm sayin.

DIAZ:     (Unintelligible)

LOPEZ:    Right now, you know the feds are on me, right now.

DIAZ:     For what?

LOPEZ:    For that bullshit.  I sold someone a burner, man, last like last, a couple of months back, and they got bagged and the, I'm scared of the niggers snitchin me out.

DIAZ:     And who the fuck are they?

LOPEZ:    The niggers from Manchester, man.

DIAZ:     You know who they are?

LOPEZ:     Yeah . . . but I'm just scared that they, you know what I'm sayin?

DIAZ:      Now, come on, Eddie, man . . .

LOPEZ:     . . . they've been after me for a couple of years . . .

                    *   *   *   *   *

LOPEZ:     I'm gonna call my connect right now and to have them two eggs for you.

LOPEZ:     <u>Yo, esta linda,</u> dog.  (Yo, it's a beauty, dog.)  It goes off like water, dog.  Bang, bang, bang . . .

DIAZ:      <u>Y donde se saca el peine</u>?   (And where does the magazine come off?)

LOPEZ:     <u>El peine, aqui</u>.  (The magazine, here.)

           [Laughter]

LOPEZ:     (Unintelligible) quick release, quick release.

DIAZ:      That's a fucking nasty boy right there son.
LOPEZ:     <u>Ya tu sabes, papi</u>.  (Now you know, papi.)

DIAZ:      Diablo you niggas licked it too.  I wish you niggas would had waited for me man.  Damn, how many you niggas licked yesterday?

LOPEZ:     Nine.   Tan, tan, tan, tan.  We licked it up there, going up the hill. . . .

Later that day, Lopez and the CW met at Lopez's house and Lopez sold the CW 19.6 grams for $1,700.  While they sat in Lopez's bedroom waiting for his heroin supplier to arrive, Lopez went to his closet, pulled out a bag containing approximately three ounces, and showed it to the CW and said it came "straight

from the kilo". They engaged in the following taperecorded conversation.

LOPEZ: Yeah, I got some ill <u>ya yo</u> (cocaine)

DIAZ: For sale too?

LOPEZ: <u>El ya yo</u> (the cocaine). Yeah but it's it's kind of expensive right now, you don't even want to fuck with it.

DIAZ: Damn it I needed some too man.

LOPEZ: It's pure, it's pure, it's pure . . .

DIAZ: I needed some . . .

LOPEZ: You can stomp on that shit, one for one, it's one for one.[3]

DIAZ: <u>Ya yo. Me esta dando ahora mismo</u>. (It's really hitting me right now.)

LOPEZ: <u>Ya ya. Aqui hay como tres que me quedan. Yo voy ensenar un perrico aqui ahora mismo</u>. (Right, right. Here there are about three I have left. I'm going to show you some cocaine here right now). Straight from the kilo, <u>miralo aqui, mira</u> (look at it here, look) smell it . . .

DIAZ: I can smell it right now, nigga.

LOPEZ: Smell it, smell it, smell it, smell it . . . (unintelligible)

DIAZ: Oh, that's like <u>acama</u> (fish scales) almost, nigga.

*   *   *   *   *

DIAZ: How much you got? How much you got the ounces for?

---

[3] The testimony was that this reference was to cutting one ounce of the cocaine with a cutting agent so that you had two ounces to sell.

LOPEZ:      I give you, um, I give you a disk of 14 te sale como (it will come out to) 5 bills.  I got it, I got this one for one, no a half ounce.

DIAZ:       Oh, a half ounce.

LOPEZ:      Five bills.  So an ounce is like a "G" pero (but) you can stomp one for one.

DIAZ:       So, out of an ounce you'll get another one.

LOPEZ:      Right, another one.

DIAZ:       Que bonito! (How pretty!)

LOPEZ:      Cause its puro (pure).  That's from the brick.  That's from the kilo.

DIAZ:       It looks like it's right from the brick (unintelligible)

                    *   *   *   *   *

DIAZ:       God, that shit is making me sick right now man.

LOPEZ:      You see, you see, that's es un perico puro (it's pure cocaine) man.  (unintelligible)

On December 17, 2003, Lopez sold the CW 13.3 grams of cocaine for $600.  The sale took place at the home of Victor Delgado.  When the CW walked in to the house, Lopez was sitting on the couch with a large bag of cocaine.  Lopez took a smaller bag of cocaine and threw it the CW in exchange for the $600 in OGC.[4]

---

[4] During this meeting, Lopez said he got another gun but that he was going to keep this one.

9

On January 20, 2004, pursuant to arrest and search warrants, agents arrested Lopez at his residence, 594 Haverhill Street, Apt. 1 in Lawrence, and conducted a search of the residence. Agents found a Heckler Koch ("HK") USP Compact .45 caliber automatic pistol bearing serial #29-013016, loaded with a magazine containing 8 bullets, in the pocket of a jacket in the closet in Lopez's bedroom.[5]

Agents also found numerous items consistent with drug trafficking throughout the apartment, including in Lopez's bedroom and in the closet where the gun was found. Among other things, the following items were recovered during the search: a coffee grinder that tested positive at DEA NERL for traces of

---

DIAZ:   Another burner?  What is it?

LOPEZ:  Its sick . . . sicko.

DIAZ:   Can you sell me that one too?

LOPEZ:  I paid top dollars for this one.  This one's a new, this one's a new four fifth that came out . . . a limited edition, compact, small, like that.

DIAZ:   How much you want for it?  You gonna sell it or you gonna sell it or you gonna keep it for you?

LOPEZ:  I'm gonna keep it for me.

[5] While taking LOPEZ to the police station, agents asked LOPEZ if there was a gun in the house.  LOPEZ said there was a gun under his bed.  When no gun was found under the bed, agents again asked LOPEZ about the gun and LOPEZ said that he had forgotten that he had it with him the previous night and that it was in his coat pocket in the closet.

heroin hydrochloride and cocaine hydrochloride; a scale that tested positive at DEA NERL for traces of cocaine hydrochloride; a metal press that tested positive at DEA NERL for traces of cocaine hydrochloride; drug ledgers; hundreds of small plastic ziplock baggies with stamps of different types on them (commonly used for packaging small amounts of cocaine and heroin for street-level distribution); a police scanner; two pagers; and a knife and a razor.

In addition, agents found cutting agents in Lopez's bedroom. DEA Chemist Maureen Craig testified at trial that the white powder substance in a clear plastic bag found in the top drawer of the nightstand in Lopez's bedroom contained approximately 22 grams of Benzocaine, which testified is a common cutting agent for cocaine and heroin in part because it is a local anesthetic and makes cocaine seem stronger.  Ms. Craig also testified that the white powder substance found in a ziplock bag in the top shelf of the closet in Lopez's bedroom (the same closet where the gun was found) contained approximately 122.9 grams of Borac acid, which she testified is a common cutting agent for cocaine in part because of its shiny appearance (which makes cocaine look pure). Ms. Craig further testified that the substance found in a plastic bottle on the VCR in Lopez's bedroom (along with a knife and a razor) contained approximately 206.9 grams of Inositol, which she testified is a common cutting agent for cocaine and heroin.

Special Agent Mark Karangekis of the FBI, a longtime gang investigator in the Lawrence area, testified at trial that, in his experience, drug traffickers often carry and possess guns to protect their drugs and drug trafficking proceeds from being stolen. He further testified that, in his experience, drug traffickers often make it know to others that they carry a gun in order to discourage people from robbing them.

The jury convicted Lopez of possessing the gun found in Lopez's closet in furtherance of his drug trafficking activities and of engaging in a conspiracy to distribute at least 500 grams of cocaine.

B.   **THE BLAKELY ISSUE**

In his objections to the PSR, the defendant, based on Blakely v. Washington, 124 S.Ct. 2531 (2004), objects to the usage of the United States Sentencing Guidelines in determining the defendant's sentence. The jury in this case found that the drug weight was in excess of 500 grams of cocaine and the possession of a firearm in furtherance of a drug trafficking offense has a statutory, five year on after penalty (see 18 U.S.C. § 924(c)). The only potential Blakely issue therefore concerns the defendant's status as a career offender based on his prior convictions.[6] The First Circuit has clearly stated,

---

[6] Under the career offender provision, the drug weight and the § 924(c) violation are taken into account and drive the offense level. Under that provision, the offense level is

12

however, that <u>Blakely</u> does not effect enhancements based on prior convictions. This is consistent with the position of the vast majority of circuit courts.

In <u>United States v. Stearns</u>, 03-2340 at 5-6 (1st Cir. Nov. 1, 2004), the First Circuit stated that "the <u>Blakely</u> decision does not encompass sentencing enhancements based upon 'the fact of prior conviction,' which is not the type of circumstance which the Sixth Amendment mandates be determined by a jury, rather than the sentencing court." (quoting <u>United States v. Cordoza-Estrada</u>, 385 F.3d 56, 59 (1st Cir. 2004) ("In <u>Apprendi</u>, the Supreme Court stated: 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' <u>Blakely</u> did not disturb the distinction between 'the fact of a prior conviction' and other facts that 'increase the penalty for a crime beyond a prescribed maximum.'") (citations omitted)).

The defendant in <u>Stearns</u> was convicted of being a felon in

---

determined with regard to the offense statutory maximum. In this case, based on the drug weight and the defendant's prior drug trafficking conviction, the defendant's statutory minimum sentence is 10 years and his statutory maximum sentence is life. <u>See</u> 21 U.S.C. § 841(b)(1)(B). Under U.S.S.G. § 4B1.1, since the offense statutory maximum is life, the offense level is 37 (leading to a guideline range of 360 months to life). Under § 4B1.1(c), the five year on and after penalty imposed by 18 U.S.C. § 924(c), is added to the guideline range, resulting in a guideline range of 420 months to life

possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The district court then enhanced his sentence, pursuant to the armed career criminal provision of U.S.S.G. § 4B1.4, based on his four prior convictions. Stearns, 03-2340 at 2. Since the defendant did not raise a Sixth Amendment issue at sentencing, the First Circuit's Blakely review was for plain error. Id. at 4. Regardless of the standard of review, the First Circuit's reasoning simply cannot be squared with a decision by this Court that the career offender provision of the guidelines does not apply because of Blakely.

The Stearns court rejected the defendant's Blakely argument, reasoning that "the Blakely decision does not encompass sentencing enhancements based upon 'the fact of prior conviction,' which is not the type of circumstance which the Sixth Amendment mandates be determined by a jury, rather than the sentencing court." Id. at 5-6. See also United States v. McGuire, 389 F.3d 225 (1st Cir. Nov. 17, 2004) (rejecting, on plain error review), a defendant's Blakely challenge to the district court's decision that he was a career offender under the sentencing guidelines, on the grounds that "'[w]hether a prior conviction qualifies as a predicate offense under [section] 4B1.1 is a question of law'") (quoting United States v. Santos, 363 F.3d 19, 22 (1st Cir.2004)).

The First Circuit's statements in Stearns, Cordoza-Estrada,

14

and McGuire are based on the distinction drawn by the Supreme Court, first in Apprendi, and then confirmed in Blakely, that the Sixth Amendment concern underlying both those decisions relates to sentencing enhancements based on fact-finding by judges (rather than juries), and that those concerns are not implicated by enhancements based on prior convictions.  Indeed, the Supreme Court made this distinction explicit in Almendarez-Torres, which Blakely did not overrule.

In Almendarez-Torres v. United States, 523 U.S. 224, 229-48 (1998), the Supreme Court squarely held that facts concerning a defendant's prior convictions need not be presented to the jury even though such facts may enhance a defendant's sentence.  The Court stated:  "the sentencing factor at issue here -- recidivism -- is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence."  Id. at 243.  Blakely does not overrule the Court's decision in Almendarez-Torres.  Consequently, Blakely does not prevent the courts from considering the fact of a prior conviction during sentencing.

Since Blakely was announced, several courts have addressed the use of prior convictions during sentencing and have consistently held that a sentencing judge may take prior convictions into consideration when determining a sentence.  See, e.g., United States v. Moorer, 383 F.3d 164, 169 (3d Cir.2004)

(reasoning that <u>Blakely</u> applied only to factual determinations and that the defendant's status as a career offender was "purely a matter of law under the Sentencing Guidelines"); <u>United States v. Marseille</u>, 377 F.3d 1249, 1256 n. 14 (11th Cir.2004) ("We have reviewed Blakely and conclude that it is inapposite . . . . [T]hough the district court found that Marseille had prior convictions, <u>Blakely</u> does not take such fact-finding out of the hands of the courts."); <u>United States v. Quintana-Quintana</u>, 2004 WL 2047358, *1 (9th Cir. 2004)(holding that <u>Blakely</u> does not change the prior conviction exception carved out in <u>Apprendi</u>); <u>United States v. Sanders</u>, 377 F.3d 845, 847 n. 3 (8th Cir.2004) ("While the Court [in <u>Blakely</u>] declared unconstitutional any increase in penalty beyond the prescribed statutory maximum based on facts not submitted to a jury and proved beyond a reasonable doubt, the Court expressly exempted 'the fact of prior conviction.'"); <u>United States v. Cooper</u>, 375 F.3d 1041, 1052 n. 3 (10th Cir.2004) (describing Blakely as "reaffirming" <u>Apprendi's</u> exception for the fact of a prior conviction); <u>United States v. Rodriquez</u>, 2004 WL 2034850, *1 (N.D. Ill. 2004) ("[T]he factor that set the Sentencing Guideline §4B1.1(A)'s career offender provision -- and in that regard <u>Blakely</u> (like the <u>Apprendi</u> case that preceded it) expressly teaches that a defendant's prior criminal history (the fact that triggered career offender status for [the defendant]) does not have to be submitted to a jury for

determination."); United States v. Byrd, 2004 WL 1618832, *2 (W.D. Tex. 2004) (Blakely decision did not preclude the court from finding that defendant was a career offender for sentencing purposes); United States v. Losoya-Mancias, 332 F.Supp.2 1261 (N.D.2004) (rejecting career offender challenge, reasoning that, "[a]n exception has been carved out for prior convictions and that was the express holding in Almendarez-Torres"); United States v. Burrell, 2004 WL 1490246 (W.D.Va. July 6, 2004).

The Seventh Circuit's recent decision in United States v. Pittman, 388 F.3d 1104 (7th Cir. Nov. 12, 2004), is typical of the approach taken by the federal courts of appeal on this issue. In that case, the court squarely held that the imposition of an increased sentence under the career offender sentencing guideline did not violate Blakely. The court reasoned as follows.

> We consider first Pittman's challenge to the use of the two prior felony convictions. In Almendarez-Torres v. United States, 523 U.S. 224, 244, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the Supreme Court held that prior felony convictions were sentencing factors that need not be charged in an indictment nor proven beyond a reasonable doubt because they are not elements of the charged offense. That decision has not been overruled by Apprendi or Blakely. See United States v. Marseille, 377 F.3d 1249, 1257 (11th Cir.2004) (noting that neither Apprendi nor Blakely removes the determination of prior convictions from the court in light of Almendarez-Torres). We have held in post-Apprendi cases that Almendarez-Torres controls, and that evidence of a prior conviction that would increase the statutory maximum does not need to be submitted to a jury. Blakely did not disturb Almendarez-Torres, and therefore the district court did not err in considering the prior felony convictions.

17

<u>Pittman</u>, 388 F.3d at 1109.

For the foregoing reasons, any argument that the career offender provisions do not apply is foreclosed by <u>Almendarez-Torres</u>, by the clear import of First Circuit, post-<u>Blakely</u> rulings in <u>Stearns</u> and <u>Cordoza-Estrada</u>, and by the overwhelming weight and logic of federal decisions throughout the country.

## **CONCLUSION**

The government requests that the Court sentence the defendant to a term of imprisonment within the guideline range of 420 months to life.

                Respectfully submitted,

                MICHAEL J. SULLIVAN
                United States Attorney,

By:  <u>/S/ PETER K. LEVITT</u>
      PETER K. LEVITT
      Assistant U.S. Attorney
      One Courthouse Way
      Boston, MA 02210
      (617)748-3355

December 16, 2004

**CERTIFICATE OF SERVICE**

    I, Peter K. Levitt, do hereby certify that a copy of the foregoing was served on Ray Gillespie, counsel for Eddy Lopez, by facsimile on December 16, 2004.

                                    /S/ PETER K. LEVITT
                                    Peter K. Levitt