UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>)<br>EDDY LOPEZ, A/K/A "SWIFT" )<br>  Defendant. ) | Cr. No. 04-10033 PBS |

**SUPPLEMENTAL SENTENCING MEMORANDUM OF THE UNITED STATES**

This memorandum is submitted, in light of the Supreme Court's recent decision in United States v. Booker, 2005 WL 50108 (Jan. 12, 2005), to supplement the government's previously filed Sentencing Memorandum, dated December 16, 2004.  Sentencing is scheduled for January 27, 2005.  As of the morning of January 25, 2005, the defendant had not filed a sentencing memorandum.  The government anticipates, however, that the defendant will argue that, under Booker, the Court should sentence the defendant to something less than his Sentencing Guideline Range of 420 months to life.  The government files this supplemental memorandum to address this issue.  The government reserves its right to respond to specific arguments in any sentencing memorandum the defendant subsequently files.

The Presentence Report prepared by the U.S. Probation Office, dated December 8, 2004 (the "PSR"), properly calculated the defendant's Sentencing Guideline Range as 420 months to life. The only relevant guideline issue in this case is the defendant's

status as a career offender.[1]  Based on the evidence adduced at trial, and for the reasons presented herein and in the government December 16, 2004 Sentencing Memorandum, the Court should lend particularly heavy weight to the Guidelines calculation of the defendant's sentencing range, and sentence the defendant within that range.  The government requests that the Court impose a sentence of 420 months, representing the low end of the guideline range.  A sentence below 420 months would be unreasonable under Booker.

    A.    **THE BOOKER DECISION**

In the first part of its decision in Booker, the Court held that the mandatory nature of the violated the defendant's Sixth Amendment right to a jury trial by requiring judges to find facts which in turn increase a defendant's sentence beyond what could be imposed based solely on the jury's verdict.  Booker, 2005 WL

---

[1] The defendant's sentencing range is guided by the following factors.  First, the drug weight (over 500 grams of cocaine found by the jury) implicates a statutory, mandatory minimum sentence of 5 years and a statutory maximum sentence of 40 years.  See 21 U.S.C. § 841(b)(B)(ii).  Second, because the defendant has a prior drug trafficking conviction, and the government filed a notice pursuant to 21 U.S.C. § 851, the statutory mandatory minimum becomes 10 years and the statutory maximum becomes life.  See 21 U.S.C. § 841(b)(B).  Because the defendant was convicted of possessing a firearm in furtherance of a drug trafficking offense, there is an additional, mandatory five year, on and after, sentence imposed by 18 U.S.C. § 924(c).  Under the career offender provision (U.S.S.G. § 4B1.1), the defendant's offense level is 37 (the offense level under the career offender provision is driven by the statutory maximum sentence of life) and his criminal history category is VI.  This leads to a Guideline Sentencing Range of 420 months to life.

at *14.  See also United States v. Wilson, 2005 WL 78552 at *1 (D.Utah) (Jan. 13, 2005).[2]  In the second part of its decision, the Court held that, by severing the two provisions of the Sentencing Reform Act of 1984 (the "Sentencing Reform Act") that make the Guidelines mandatory, the rest of the sentencing scheme contained in the Sentencing Reform Act and the Guidelines could be preserved.  Booker, 2005 WL at *16; Wilson, 2005 WL at *1.[3] "So modified," the Court continued, "the Federal Sentencing Act . . . makes the Guidelines advisory."  Booker, 2005 WL at *16.

Significantly, the Booker Court struck only the two provisions of the Sentencing Reform Act mentioned above.  The Court explained that Congress would have wanted "to maintain *all*

---

[2] On the day after the Court decided Booker, Judge Cassell of the United States District Court for the District of Utah issued a comprehensive and detailed decision applying Booker. See United States v. Wilson, 2005 WL 78552 (D.Utah) (Jan. 13, 2005).  Wilson is particularly instructive in this case because it also involved application of the career offender provision of the guidelines.  As summarized below, the Wilson court concluded that "in all future sentencings, the court will give heavy weight to the Guidelines in determining an appropriate sentence" and "will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons."  Id. at *1.  Applying these principles, the court sentenced the defendant at the low end of the Sentencing Guideline Range.  Id.  For the Court's convenience, a copy of the Wilson opinion is attached hereto as Exhibit A.

[3] Specifically, the Court held that 18 U.S.C. § 3553(b)(1) and 18 U.S.C. § 3742(e) were "incompatible" with the Court's holding; the former provision stated that courts "*shall* impose a sentence . . . within the range" established by the Guidelines and the latter provision mandated a *de novo* standard of review which the Court found depended upon the Guidelines' mandatory nature.  Booker, 2005 WL at *16; Wilson, 2005 WL at *1.

3

provisions of the [Sentencing Reform] Act and engraft today's constitutional requirement onto that statutory scheme." Booker, 2005 WL at *27 (emphasis added). The Court therefore severed a provision rendering the Guidelines mandatory -- 18 U.S.C. § 3553(b) -- but left in place the adjoining provision -- § 3553(a). Section 3553(a) lists the general purposes of sentencing and directs that sentencing courts "*shall consider*" certain factors when imposing sentence, including "the kinds of sentence and the sentencing range established" by the Guidelines. 18 U.S.C. § 3553(a).

According to Booker, this provision "*requires* a sentencing court to *consider* Guidelines ranges . . . but it permits the court to tailor the sentence in light of other *statutory* concerns as well." Booker, 2005 WL at 16 (emphasis added). Booker also directs courts to abide by the other provisions of the Sentencing Reform Act:

> Without the "mandatory" provision, the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals . . . .  The Act . . . requires judges to consider the Guidelines sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant, the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims.  And the Act . . . requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care.

Id. at 24 (internal quotations omitted).

Finally, Booker held that, because the Sentencing Reform Act continues to provide for appeals from sentencing decisions, sentences imposed by district courts must be reasonable in light of the factors set forth in the Sentencing Reform Act, including the recommended Guidelines sentence.  Id.  See also Wilson, 2005 WL at *2 (noting that, while the Guidelines are no longer mandatory, the rest of the Sentencing Reform Act is and the remaining provisions of the Act require the court to consider the Guidelines in determining the sentence").

Booker did not explicitly instruct sentencing courts as to how much weight they should accord the Guidelines (the issue was not presented).  The Wilson court properly concluded that the logical inference of Booker is that sentencing courts should accord heavy weight to the Guidelines.  As explained below, this is particularly true when dealing with the career offender provision of the Guidelines because of the unique, statutory mandate attendant that provision.

> **B.   THE COURT SHOULD GIVE "HEAVY" WEIGHT TO THE SENTENCING GUIDELINES GENERALLY**

In Wilson, the court conducted a comprehensive review of Booker and the Sentencing Reform Act, and concluded that "in all future sentencings, the court will give heavy weight to the Guidelines in determining an appropriate sentence" and "will only depart from those Guidelines in unusual cases for clearly

5

identified and persuasive reasons." <u>Wilson</u>, 2005 WL at *1.  In support of this conclusion, the <u>Wilson</u> court reasoned (in summary) as follows.

> The Sentencing Reform Act requires the court to impose sentences that "reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, [and] protect the public." The court must also craft a sentence that "afford[s] adequate deterrence to criminal conduct" and "protect[s] the public from further crimes of the defendant."  Finally, the court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Over the last 16 years, the Sentencing Commission has promulgated and honed the Guidelines to achieve these congressional purposes.  Congress, too, has approved the Guidelines and indicated its view that Guidelines sentences achieve its purposes.  Indeed, with respect to the congressionally-mandated goal of achieving uniformity, the Guidelines are the only way to create consistent sentencing as they are the only uniform standard available to guide the hundreds of district judges around the country.  Therefore, in all future sentencings, the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons.

<u>Id.</u> at *1 (internal citations omitted).

The essential premise of <u>Wilson</u> is that the discretion authorized by <u>Booker</u> "must . . . be exercised court so as to comply with additional congressional mandates." <u>Id.</u> at 3.  The court explained:

> Even as modified by <u>Booker</u>, the Sentencing Reform Act continues to direct that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in the Sentencing Reform Act.  Those purposes are:

6

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .
>
> In light of the congressional command that the court "shall" impose a sentence that is sufficient "to comply with the[se] purposes," the court must impose a sentence that achieves, for example, "just punishment" for an offense and which "afford[s] adequate deterrence to criminal conduct."

Id. at *3 (quoting 18 U.S.C. § 3553(a)(2)) (other citations omitted).

The Wilson court concluded that Guideline sentences generally achieve the Congressionally-mandated purposes of punishment. Id. at *3-4 (reasoning that the best way to determine what particular sentence achieves such things as "just punishment" and "adequate deterrence" is to look to the Sentencing Guidelines).  In support of this conclusion, the court reviewed the history of the Sentencing Commission[4] and the Sentencing Guidelines, and reasoned as follows:

> Congress' creation of the Commission and subsequent approval of the Commission's Guidelines provide strong reason for believing that Guidelines sentences satisfy

---

[4] The court noted:  "When it passed the Sentencing Reform Act, Congress created the Sentencing Commission.  The Commission is an expert agency specifically designed to assist the courts in imposing sentences that achieve the purposes of punishment." Id.

7

>  the congressionally-mandated purposes of punishment.
>  It would be startling to discover that while Congress
>  had created an expert agency, approved the agency's
>  members, directed the agency to promulgate Guidelines,
>  allowed those Guidelines to go into effect, and
>  adjusted those Guidelines over a period of fifteen
>  years, that the resulting Guidelines did not well serve
>  the underlying congressional purposes.  The more likely
>  conclusion is that the Guidelines reflect precisely
>  what Congress believes is the punishment that will
>  achieve its purposes in passing criminal statutes.

Id. at *4.[5]

The Wilson court also concluded that the Guidelines "generally achieve 'just punishment,' and . . . crime control purposes."  Id. at *5-7 ("[t]he concept of 'just punishment' requires the court to consider society's views as to appropriate penalties, not just a judge's own personal instincts").  Most importantly, the court recognized that the Guidelines should be followed (except in the most unusual circumstances) to "avoid

---

[5] The Wilson court also noted that, in the recently adopted "Feeney Amendment," Congress "reconfirmed . . . its expectation[] that courts follow the Guidelines."  Id. at *4.  The court noted:

> In 2003, Congress passed the Feeney Amendment to the
> Act, which was designed to address what [it] called
> "the serious problem of downward departures from the
> Federal Sentencing Guidelines by judges across the
> country."  The Feeney Amendment was meant to "put
> strict limitations on departures by allowing sentences
> outside the guidelines range only upon grounds
> specifically enumerated in the guidelines as proper for
> departure.  This would eliminate ad hoc departures
> based on vague grounds, such as `general mitigating
> circumstances.'"

Id. *5.

unwarranted sentencing disparities." Id. at 12.

> A final reason for giving heavy weight to the Guidelines to avoid unwarranted sentencing disparity. Avoiding unwarranted sentencing disparity was the main goal of the Sentencing Reform Act. The Guidelines were primarily formulated to "eliminate the unwarranted disparities that proliferated under the prior sentencing regime and to foreclose the consideration of race, gender, and other illegitimate factors at sentencing." As Booker explains, Congress' "basic statutory goal in enacting the Guidelines was to provide a sentencing system that diminishes sentencing disparity" and "to move the sentencing system in the direction of increased uniformity." In an effort to achieve this end, "Congress directed the [Sentencing] Commission . . . to provide certainty and fairness in sentencing and avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted."

Id. at 11 (citations omitted).

The court continued:

> While Booker renders the Guidelines advisory, the court is still obligated to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct . . . ." The only way of avoiding gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases. The only standard currently available is the Sentencing Guidelines. If each district judge follows his or her own views of "just punishment" and "adequate deterrence," the result will be a system in which prison terms will "depend on 'what the judge ate for breakfast' on the day of sentencing" and other irrelevant factors. Such a result would be intolerable in a society committed to the rule of law and to equal treatment of offenders regardless of race, class, gender, or geographical location. It would, in short, be a return to the pre-Guidelines days, which "produced astounding disparities among the sentences that were imposed on defendants convicted of the same offense with similar

      backgrounds with different judicial districts across
the country--and even among different judges in the
same district."

Id. at *12 (citations omitted).

The only way for sentencing courts to satisfy the statutory directive to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), is to accord heavy weight to the Guidelines and presumptively apply the Guidelines. Indeed, under Booker, sentencing courts that impose a sentence outside the applicable, advisory Guidelines range must state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so.  18 U.S.C. § 3553(c).

Based on all these considerations, the court in Wilson sentenced the defendant, who, like Eddy Lopez, was a career offender under the Sentencing Guidelines, to a sentence at the low end of the applicable Sentencing Guideline Range.

      **C.**    **THE COURT SHOULD GIVE PARTICULARLY HEAVY WEIGHT TO THE CAREER OFFENDER PROVISION**

The career offender provision of the Guidelines is unique and should be accorded particularly heavy weight by sentencing courts.  The Sentencing Commission promulgated the career offender provision pursuant to a clear and specific Congressional policy declaration which was embodied in statute.  In 28 U.S.C. § 994, entitled "Duties of the Commission", Congress directed the

Commission to create a guidelines provision that would ensure that a certain, defined category of repeat offenders (so called "career offenders") would be sentenced to a term of imprisonment at or near the maximum term authorized.

Section 994 directed the Commission as follows:

> (h) The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and--
>
> > (1) has been convicted of a felony that is--
> >
> > > (A) a crime of violence; or
> > >
> > > (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.); and
> >
> > (2) has previously been convicted of two or more prior felonies, each of which is--
> >
> > > (A) a crime of violence; or
> > >
> > > (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.).

28 U.S.C. § 994(h).

In light of this Congressional directive, the Sentencing Commission promulgated the career offender provision of the guidelines -- U.S.S.G. §4B1.1, which essentially mirrors 28

U.S.C. § 994(h).  Accordingly, this Court should accord particularly heavy weight to the guideline sentencing range in this case (420 months to life) because it is based so clearly on both the Congressional and Commission view that career offenders should be sentenced to a term of imprisonment at or near the maximum allowable.

      **D.**    **EDDY LOPEZ IS PRECISELY THE TYPE OF CAREER OFFENDER CONTEMPLATED BY CONGRESS AND THE SENTENCING COMMISSION**

Eddy Lopez is precisely the type of career offender contemplated by Congress and the Sentencing Commission.  The defendant is (or was prior to his arrest) the leader of a violent Lawrence street gang -- the Dome Dwellers.  The evidence adduced at trial, and summarized in the government's December 16, 2004 sentencing memorandum, established that Eddy Lopez was a large scale heroin, cocaine, and drug trafficker in Lawrence -- a city rife with gang, drug, and gun problems.  The defendant sold a government cooperating witness (the "CW"), a 9 millimeter, Smith & Wesson, semi-automatic pistol, heroin, and cocaine.  He repeatedly bragged on audio and video tape about his connections for guns and drugs, of selling other guns, and of shooting guns off on the highway rapid fire style.  He also discussed on tape the kind of guns he likes -- the small ones, the ones that are easy to conceal in a jacket pocket.

When FBI agents exercised a search warrant at Eddy Lopez's

house (the house he shared with his mother), they found a veritable drug laboratory -- e.g., a coffee grinder with traces of heroin and cocaine; a scale with traces of cocaine; a metal with traces of cocaine; drug ledgers; large amounts of three different kinds of cutting agents for breaking down heroin and cocaine; hundreds of small plastic ziplock baggies with stamps of different types on them (commonly used for packaging small amounts of cocaine and heroin for street-level distribution); a police scanner; two pagers; and a knife and a razor.

Agents also found a Heckler Koch ("HK") USP Compact .45 caliber automatic pistol loaded with a magazine containing 8 bullets. The gun was found in the pocket of a black North Face down jacket in the closet of Lopez's bedroom. This was the same jacket worn by Lopez during the recorded controlled buys in this case. Special Agent Mark Karangekis of the FBI testified at trial that, after he arrested Lopez on the day of the search, Lopez first told him that there when a gun under his bed. When no gun was found in that location, Lopez said that he had forgotten that he had it with him the previous night and it was in his coat pocket in the closet.[6]

Lopez's criminal history is consistent with what the

---

[6] Lopez tried to escape out a window when agents entered his house with a warrant. He was discouraged from doing so by police dogs outside the window.

investigation revealed about him (i.e., that he is a violent, life long criminal). He has 1995 convictions in New Hampshire for possession with intent to sell crack cocaine and resisting arrest. PSR ¶ 84.[7] During the episode in question, Lopez violently resisted arrest and gave several false names and birthdates (he was charged under the name "Eddy Torres", his mother's maiden name), patterns that show up throughout his criminal history.[8] Police records describe the arrest, in pertinent part, as follows:

> As he was being placed under arrest, the defendant pulled loose and shoved the officer, who tackled him. The defendant tried to punch [the officer] and kicked the officer in the left knee. He was sprayed with OC (pepper) spray as he continued to fight. The defendant gave police several false names and dates of birth.

PSR ¶ 84.

Lopez also has 2002 convictions in Lawrence for resisting arrest, operating a motor vehicle negligently so as to endanger, and failure to stop for police while operating a motor vehicle.[9] According to the police report of the incident, a marked police cruiser pulled Lopez over for speeding in a black Acura. After

---

[7] This is one of the career offender predicates.

[8] Court records indicate that Lopez has used the following aliases: Raymond Amill; Luis Santiago; Miguel Torres; Jose Lopez; Swift; and numerous variations on Eddy Lopez, such as Eddie M. Lopez, Eddy M. Lopez, Jr., and Eddie Miguel Lopez Torres.

[9] The resisting arrest is the second career offender predicate.

the stop, the police officer approached the Acura on foot from behind. As the officer approached, Lopez took off in the Acura, screeching his tires and leaving a trail of smoke. The police officer got in his cruiser and pursued Lopez, who cut off a funeral procession on two occasions, screeched his tires, and cut off other motor vehicles. PSR ¶ 91.

Lopez eventually lost control of the Acura and ended up on the sidewalk. Lopez got out of the car, and the officer pointed his gun at him and told him to put his hands in the air. Lopez then fled on foot. The officer chased Lopez who fell to the ground. The officer grabbed him and Lopez resisted arrest and fought to get up. The officer finally subdued Lopez by spraying him with mace. PSR ¶ 91.

Lopez also has convictions for resisting arrest, disorderly person, and operating a car after his right to operate was revoked (2000), PSR ¶ 89; leaving the scene after committing property damage with a car (2000), PSR ¶ 87; buying/receiving a stolen car (1993), PSR ¶ 81; and adjudications of delinquency for buying/receiving a stolen car and attempted bribery (1991). PSR ¶ 80.

The defendant also has 2002 charges pending against him in Franklin Superior Court for assault & battery, threatening to commit murder, and two counts of assault with a dangerous weapon. PSR ¶ 98. The police reports regarding this incident indicate

15

that officers went to the home of a woman who had reported a domestic abuse.  Upon being interviewed, the woman stated that she had terminated a relationship with Lopez four years earlier and been receiving numerous calls from him in which he stated that he was going to kill her.  She said she had received 28 calls from Lopez that day.

The woman said Lopez had come over that day, forced his way into her apartment, and threatened to take her upstairs and kill her.  The woman stated that Lopez always carried a blue steel pistol.  She also said that Lopez said he was going to kill her and drag her into the woods.  When she tried to get away, the defendant grabbed her by the hair and ripped out a handful.  She also said Lopez punched her with his fists.  Officers saw a handful of brown hair in her apartment and several large lumps on her forehead.  A witness on the scene told officers that he saw the woman running from her apartment yelling "help me" and "get away", and then saw Lopez grab the woman by her hood to keep her from getting away.  PSR ¶ 98.

A police officer subsequently saw the Lopez driving in his car.  The officer tried to pull Lopez over but Lopez would not stop; instead Lopez sped away, passing other cars, and swerving

from right to left in heavy traffic.  The PSR continued:

> A police officer had to swerve his vehicle out of the way to avoid being struck by the defendant's motor vehicle.  Shortly thereafter, the defendant's vehicle entered a parking lot, collided with a two to three-foot snowbank, and became airborne.  The vehicle landed and the front bumper fell off.  The vehicle then drove over the snow bank, became airborne again, and crashed into a police cruiser.  The defendant sped off out-of-control and crashed head-on into a cement wall.

PSR ¶ 98.  Lopez got out of the car and ran away on foot, failing to stop when two officers chased him yelling "stop police".  Several officers finally cornered Lopez in a garage.  Lopez refused to comply with their orders to put his hands above his head.  The officers eventually had to fire pepper balls at Lopez (which did not function properly) and then "rush" him and subdue him.  PSR ¶ 98.

Lopez also has 2003 charges pending in Lawrence District Court for assault & battery.  PSR ¶ 99.  Lopez also has other arrests for assault & battery, breaking and entering, threatening to commit murder, assault with a dangerous weapon (gun), discharging a firearm within 500 feet of a school, and possession of a firearm without a license.  PSR ¶¶ 100-103.

Lawrence District Court records indicate that Jesenia Duran, the mother of Lopez's child, obtained an abuse prevention order against Lopez in 1998.  PSR ¶ 118.  According to the PSR, when

applying for the abuse prevention order, Ms. Duran wrote:

> This morning he called my house at 11:30 a.m. and said that he was going to beat me to death. So I hung the phone up. 20 mins later he was ringing the door [sic]. I won't answer so he climbed up on the porch trying to open the windows [sic]. I left down stair to my neighbors house [sic]. He was stomping on the door and broke it down. This been going on for 2 years [sic]. He beaten me before [sic]. He said he not going to give up until he see me 6 feet deep [sic] and I fear for my life & daughter.

PSR ¶ 118. According to the PSR, in his interview Lopez admitted that this incident happened and said that he was on drugs at the time. PSR ¶ 119.

For the foregoing reasons, Eddy Lopez is precisely the type of defendant Congress and the Sentencing Commission had in mind in promulgating the career offender provision of the Guidelines -- a gang leader; a repeat drug trafficker; a repeat violent offender; a predator who sells guns and drugs, shoots guns off on public highways, and possesses a gun in furtherance of his drug trafficking business. A sentence at the low end of the Sentencing Guideline Range (420 months) is reasonable. Under the circumstances, a sentence below the Sentencing Guideline range would be unreasonable.

**CONCLUSION**

For the foregoing reasons, the government requests that the Court sentence the defendant, Eddy Lopez, to a term of imprisonment of 420 months, representing the low end of the Sentencing Guideline Range.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney,

                    By:  /S/ PETER K. LEVITT
                         PETER K. LEVITT
                         Assistant U.S. Attorney
                         One Courthouse Way
                         Boston, MA 02210
                         (617)748-3355

January 25, 2005

**CERTIFICATE OF SERVICE**

    I, Peter K. Levitt, do hereby certify that a copy of the foregoing was served on Ray Gillespie, counsel for Eddy Lopez, by facsimile on January 25, 2005.

                                        /S/ PETER K. LEVITT
                                        Peter K. Levitt